Please be seated. You probably noticed there are only two of us. There will be a third judge who will be in the consideration and disposition of this case. As I'm sure both of you know, the oral arguments are recorded and on the net, so the new judge will be a full participant in the consideration and disposition of the case. In the meantime, we will do our best to, of course, listen to you and ask any questions that we feel need to be asked. I believe so. Yes. Yes, it is just this moment are presiding justice. That being said, counsel, whenever you're ready, you may proceed. Thank you. May it please the court. My name is Gil Cisan, and I will present the defendant appellant, Edward Oats, in the incident case. We are seeking, by virtue of this appeal, reversal of his guilty verdict on counts one, two, and five of predatory criminal sexual assault from a trial that occurred in Jefferson County, Illinois. Now, Your Honors, we've raised four primary submissions in our main brief. The first was dealing with the admission of hearsay statements under section 115-10. The second was the sufficiency of the evidence. The third was the legality of the natural life sentence imposed on Mr. Oats. And finally, the fourth was ineffective assistance of counsel. Due to the interest of time, I'd like to sort of focus my two, at least the area of this oral argument, if it pleases the court, on issues one and three. However you wish, counsel. And obviously, I'll be more than happy to entertain any other questions you might have on it. Now, Your Honors, the facts of this case are extremely difficult. The defendant was convicted of predatory criminal sexual assault on two young children under the age of 12. Now, obviously, reading through the transcript, no one likes reading these types of cases. No one likes dealing with these types of cases. But here, it's very important for the court, especially with respect to the 115-10 analysis, to be extremely careful. Because, as through my reading of the transcript, as it showed, the admission of this hearsay statement was not only cumulative, but indeed prejudicial to the defendant on many occasions. It starts off with the statement from the first child, Taisha Kay, to Camille Jones, her substitute teacher. And then it goes on to evidence as admitted by the investigator who interviewed the three children at the Amy Center, as well as Vanessa Shaw, who was the DC investigator, as well as another officer who was in a closed captioned room listening to the interviews. So, the analysis of whether or not these statements should come in is extremely critical. Because what happened at trial was literally a pile-on. You know, this statement kept coming in, this statement kept coming in. It bolstered the other statement, bolstered the other statement. And in the end, what we had was an extremely close case. Because, obviously, Mr. Oates was acquitted of three of the counts. He was acquitted of counts three, four, and six. But, unfortunately, he was convicted of counts one, two, and five. Which, obviously, because it involved two people, resulted in him having an actual sentence. Now, Your Excellency, and I apologize, I didn't mean to refer to you as Your Excellency. We just got through a moot court competition, Judge. I apologize. That's a function of who we call our judges when we have our moot court. I apologize. It's my mistake. I apologize. Even though it probably sounds better, but I do apologize. I knew it was going to happen, too. I coached a moot court team, and I knew it was going to come out. So, I apologize. But getting back to the section 115.10 analysis. The issue really is, did the judge exercise his duty in determining the time, the content, and the reliability of the statement? And here, what you had is Judge Gamber, the Honorable Judge Gamber, came in. And he took testimony over the course of three days. And he concluded, in my opinion, summarily, that the time, the content, and the reliability were all satisfied. Because he said, Taisha Kaye came to the school, to the substitute teacher, disclosed it, and then the interview of the three kids took place soon thereafter. Well, that might be the case with respect to Taisha Kaye's statement. Taisha Kaye makes an initial complaint to her substitute teacher that, you know, yes, my mother's boyfriend was having sex with me the night before, and he's going to come back and do it again. Okay? So, the time reliability component from there might be satisfied. I would concede to the court that, okay, that timing element there. But for the other two, not necessarily the case. Because you still have Travis Dean and Tashira Dean, who, after this statement is made, basically the long and short of it, they gather all the children and bring them to the Amy Center. They keep them separated. They keep them in separate rooms. But then that's where the interview starts. And so what we have here is a situation where, while the time reliability and content element might apply to Taisha, it doesn't necessarily apply to Tashira and Travis's statement. And the key thing that we focused on in our briefs, Judge, was there was two videotape recordings at the Amy Center. The first one occurred, if I'm not mistaken, on March 7th, and the next one occurred on March 11th, four days later. The problem was, in the March 7th interview, the audio didn't work. And so you don't have any evidence of what questions or all you see is what happens before your eyes. I'll grant the court that it was inadvertent, and we have no reason to believe that it was suspicious or anything of that sort. But the point is, and the case law, I think, is fairly clear in the cases that we cited. Specifically, we relied on Swart, the Supreme Court case of Swart, and then the Fourth District cases of Miles and Simkins, is that when there is a prior interview, when there is a prior interview, the state bears the burden. The state must bear the burden of showing that the results were not the result of adult fronting or manipulation. Now, what the record shows here is, and I don't think, based on a review of the record, the court can come to that conclusion. Because all we have, you look through the transcripts of the motion hearing and the transcripts of the trial, the only questions that is deduced by the state to the investigators, specifically Detective McElroy, Detective Gilbert, and Vanessa Shaw, is simply, what did she disclose to you? What did she disclose to you? What did she disclose to you? There's no evidence of the type of questions that's being asked to elicit that type of information. And that, to us, is the critical distinction here as to why we believe the Section 11510 standard was not applied correctly here. Because how can a court, how can a trial court who's sitting in judgment of this evidence, determine whether or not the circumstances of the statement are reliable, and whether or not the content of the statement are reliable, if you don't know the type of questions that's being elicited? And that is the critical point here. In Miles, for example, what happened was, is that the investigator, there was evidence of a prior interview by the investigator, and then on a cross-examination, he couldn't remember the type of questions that he posed to the individual before they had the main interview, where she disclosed, the victim disclosed the statement. In Simpkins, it was similar, too. What happened was, is that you had a situation where the individual made a statement to the DCF investigator, but there was a prior interview with a social worker that was not documented or determined what the substance was. And I will grant you that there is at least some evidence of the substance of the conversation, the substance of the disclosure. But again, the question is, is how can the court make a determination of reliability of the statement and the content of the statement, and even the timing of the statement, if the specific questions aren't specifically known to the court? The only evidence that I could find in the record of questions that were posed by the prosecutor to the investigators was a specific question to, I believe it was Vanessa Shaw, who indicated on cross-examination by Ms. Costa, that was there any evidence of any other timing with respect to these incidents? And I think she had testified, I believe one of the children indicated that it might have happened sometime between Christmas and Valentine's Day. So again, that was the only evidence we have of any type of specific questions that might have been posed. And we believe it's the state's burden. It is the state's burden to do that. And if they can't do that, if they can't deduce what type of questions were there, then they can't meet their 11510 burden. And that's critical here, because if you look at the other factors, you know, the way that Judge Gamber, I believe, looked at this was basically kept it from the beginning and relied specifically on Taisha Kaye's statement. So she concluded, he concludes, that Taisha Kaye's statement makes a spontaneous statement to the school administrator, I mean the school substitute teacher, and then from there it starts this whole process where all three kids are interviewed at the Amy Center. I will grant you that with respect to the timing of Taisha Kaye's statement, yes, that is a good possibility that the timing of that would be indicative. But even if you look closely at the two statements, what we're missing here is the factor of repetition. Because she first tells, Taisha Kaye first tells her substitute teacher that, quote, my mother's boyfriend is having sex with me and he's going to come last night and he's going to come back tonight to do it again. Okay. Before she's interviewed at the Amy Center, she talks to SPAT and Pat Spacuzza, who is the school counselor. Pat Spacuzza testifies at the hearing and at trial that what Taisha Kaye disposes to her is that, oh yes, my mother's boyfriend touches me in my private parts. Very different type of statements, and one which I think the trial court overlooked because, again, it did not, while the spontaneity factor is there, the repetition factor is not. Now, a key point of this, Judge, is that the substitute teacher brought in Taisha Kaye to actually write in a statement. Write in a statement. After she found out that, oh, that there might be evidence of abuse, she put Taisha Kaye in a separate room and she made Taisha Kaye write out a written statement. And she wrote out about a three-page statement that was introduced at the motion hearing and was also introduced at trial. Now, one of the factors that the court looks to is a lack of motive to fabricate. Does the child have a lack of motive to fabricate? Well, if you look at that exhibit, I don't remember off the top of my head what it actually exhibited, I know where it is in the record, but it shows, Your Honors, that there might have been a lack of motive to fabricate. Letters do indicate some evidence of abuse, but it also says that, you know, claims of my client yelling and screaming at her, whipping her, and also the fact that Taisha Kaye might have, that she had to be quiet or she had to stop telling this stuff to other people, indicating that she had disclosed this prior to disclosing it to the substitute teacher. Again, evidence of a lack of motive to fabricate. The point is, Judge, all we're asking is that the 11510 hearing should have been done properly. We don't believe it was done in this case, specifically because the State failed to introduce the type of questions involved. And before you can do that, that's the only way the State can manage to meet its burden of showing that the statements were free of manipulation or coercion. Because they're relying on the second statement and the first statement as being reflective of each other. They're saying the testimony of trial was, what was disclosed in the first non-reported version was similar to the second non-reported version. Well, as the State pointed out in its opposition brief, it cited the case of Idaho v. Wright discussing principles of indicia of reliability. And there Idaho discussed, said something that, you know, indicia of reliability are the circumstances which make a State reliable are based on the circumstances themselves, not on other evidence of the record that might tend to corroborate it afterward. And that's what we have here. The court came to the conclusion that because the second statement and the first statement by testimony was alike, that it was reliable. But that's not the case. You have to examine each statement individually, each child statement individually, for time, time to reliability. And here, I think what the court did was do it just as sort of a one-size-fits-all, because Taishi K's statements seemed to be reliable. Everything else was reliable. And that's why it was admitted. Clearly, it was prejudicial to the defendant because of what I mentioned earlier was this piling on, this cumulative effect, and hence the implicit bolstering of the children's testimony, which in a lot of cases was inconsistent with their original disclosures. If there are no further questions of that, Your Honor, I will move to my third point, which was the natural life, the legality of the natural life sentence the President imposed on Mr. Earles. We raised two issues, one under the U.S. Constitution under the Eighth Amendment and another under the Illinois Constitution's provision regarding penalties, which commands the court to not only take into account the seriousness of the offense, but also the possibility of rehabilitation of the offender. Turning first to the Eighth Amendment argument, and just to clarify, we raised a categorical attack. Even though I looked at the brief and it does seem like we're raising a proportionality attack, we are specifically raising a categorical attack, meaning that this type of sentence categorically is illegal for a non-homicide offense. Graham v. Florida came to the conclusion that life without possibility of parole for juvenile offenders in non-homicide cases was indeed illegal under the Eighth Amendment. And we are asserting here, and the principle we're trying to put forth here, Your Honors, is that the imposition of a natural life sentence in prison for a first-time offender who has no other prior history of proclivities for sexual type offenses would indeed be the type that would be illegal under the Eighth Amendment of the U.S. Constitution. Now, the two prongs of that are, number one, what is – we look to what the other states are doing. We look to see is there some sort of consensus that has developed regarding these type of sentences. And even the court in Huddleston, the Supreme Court of Illinois in Huddleston, noted that Illinois was one of only five states to impose natural life in prison to these type of offenders. And the key here is mandatory natural life in prison without possibility of parole. What difference does it make, or what's the effect of this category being conditioned on multiple convictions? Well, Your Honor, I think when you look to the second prong of the test is, is it fair in general with these type of offenses in general, I think when you have multiple past convictions, what we've seen is a proclivity. In other words, a pact. In other words, you've had the opportunity to conform yourself to the conduct of society, and you have not. And hence, society deems more severe punishment, I guess, more appropriate, so to speak. In this case, we don't have that. Granted, we have multiple victims, but we don't have evidence of prior proclivities of this individual that he really could – I mean, while the instant conviction does indicate that he's a threat to society, there was no evidence prior to this instant offense that he was that threat to society. For example, in Huddleston, Your Honors, in that case, he did have a prior conviction, and they did find evidence of pornography in his computers. I mean, there was evidence that this individual did pose a prior threat, and the court there ruled under the Illinois Constitution that it was – that the natural life sentence wasn't deemed appropriate. But getting back to the Eighth Amendment analysis, the question is, is there a consensus regarding these type of sentences? And if you look at it clearly, Illinois clearly is an outlier state. Now, the state cited to a number of states – cited to a number of statutes in its opposition brief indicating that, oh, natural life imprisonment was permitted, etc., etc., etc. And that's correct to a certain degree. In our reply brief, we responded and distinguished each and every one of those statutes, indicating that in most of those statutes, there was – it was a range of punishment. So in other words, there was a mandatory minimum, such as anywhere from four to life or 15 to life or 20 to life. But nowhere was it that it imposed a mandatory life imprisonment. There was only one statute that did, and that was Missouri's statute, which imposed mandatory life imprisonment for an offender who assaulted a child under the age of six. All the other states – for example, Utah, Idaho, Maryland – come in and say, okay, only if there's an aggravating factor do we impose natural life imprisonment, such as a prior conviction, such as serious bodily injury to the victim, such as – I'm trying to think of another statute. Those are the two that immediately come to mind. But in this case, what's happened here is that Edward – this is Edward O.'s first offense, and he's already been given the natural life imprisonment without any evidence of aggravating factors such as serious bodily injury to the victim or prior serious sex crimes that have been committed by him, which would indicate a lack of ability to conform to society's norms, which we don't have here. Now, turning to the second prong here, Your Honors, the second prong is, is this something that the court has to make an independent judgment as to whether this type of offense categorically or this type of punishment is indeed worthy of that type of punishment? I'll grant you that there is studies that go out there that says that sexual offenders have a high risk of recidivism. I've got that, and I'm not disputing that. There definitely is. And that's why you have state statutes that come in and say, if you committed this before, you're going to get harder the second go-round. This is his first time. Granted, I know the distinction is that there's multiple victims here, and I understand that. But the question is, has he been able to conform his conduct to society before? Is there evidence of him not being able to conform his conduct to society's standards prior to that? Now, in this case, what we have is, number one, is that the offender had no prior criminal history, had actually been a very successful member of society working at, I believe, at one of the prisons as a correctional officer, had a good job, and then he gets hit with this offense. And it's a case that's closely balanced. I mean, the jury acquitted on three of the six counts. And the question is, are we going to reserve this type of punishment, this type of punishment, which is usually only reserved for first-degree murder cases, for these type of cases too? And that's the question that the court has to answer. Is it fair to do that? I mean, clearly, there is a consensus that if you take another's life and you commit the most extreme act in most of the state's code books, the state can, in turn, deprive you of your life. The problem with this type of natural life sentence imprisonment is that it is final. There is no possibility for all, at least in the other states. There was a possibility for all, albeit after 25 or 30 years. Here, it's a one-size-fits-all punishment, and that's what brings me to the Illinois Constitution. Because the Illinois Constitution commands the legislature to impose penalties that not only take into account the seriousness of the offense, but also the ability for rehabilitation of the offender. And here is where Illinois diverges from the other states in question. The other states in question, such as Idaho, that were cited by the state, Idaho, Maryland, all of those states have at least some ability for the person to show that he can get off after a good time. In other words, it's parole-eligible. In other words, I know it's 25 or 30 years down the line, but at least with the possibility of parole, it would satisfy the Illinois Constitution's command to at least take into account the possibilities for this offender to be rehabilitated. In this one-size-fits-all punishment, Your Honors, there is no chance for this offender to prove, no matter how good he does, no matter how well he does, he could be a saint forever in Pontiac Prison, which I believe where the defendant is now. He will never get out. He can never have any hope of getting out. And that's the problem with this type of sentence here under the Illinois Constitution, because it does not give effect to the plain language of that article, which commands the court, which commands the legislature, to impose punishments based on those two categories. It doesn't say and or, or it doesn't say or. It says and. Oh, you didn't finish your sentence. Go ahead. It says and. And, Your Honors, without actually taking into account the possibility for the offender to rehabilitate himself, I don't see how this could pass the cluster under the Illinois Constitution. Thank you, counsel. Counsel? Good morning, Your Honor. May I please record? Excuse me. Good morning. Counsel did a very good job, I think, outlining the factual background of this case. I would begin by noting the appropriate standard of review, because I do think it's important, and that is whether or not the circuit court abused its discretion in allowing the state to use evidence under 115-10. The abuse of discretion is the most definitional standard of review, and reversal is warranted only where the court's ruling is arbitrary, fanciful, unreasonable, or no reasonable person would take the view adopted by the trial court. So in that regard, when this court reviews the evidence of this case, it has to look at it from the perspective of whether or not the reasonable person in the trial court's shoes could come to the conclusion that there's sufficient additional liability to allow the admission of this evidence. I will admit right up front that I wish the audio had worked during the first interview. That being said, I don't think that that fact alone, as a stand-alone thing, necessarily requires a finding that the court's discretion was abused. Now, as the court's aware, 115-10 requires a court in consideration of the state's motion here. The state does bear the burden to show that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. Among the considerations that a court has to take, and Mr. Seeson touched upon these, and I don't think it's an exhaustive list, but it's a very definitive one, is the spontaneity and consistent repetition of the statement. Again, the mental state of the child, the use of terminology not expected in a child of a comparable age and lack of motive to fabricate. The facts are pretty straightforward. Taisha was the one who initially approached her teacher and reported to the teacher that she had sexually assaulted her mother's boyfriend. After some discussion there, Taisha was then allowed to, in a private area away from everyone else, to do a written statement, and that became part of the corpus, if you will, of the state's 115-10 evidence. Mr. Daley, what import in your mind does it have that all three of these children were interviewed, I guess, without any knowledge that the other one was being interviewed about the same thing, essentially? I think that's one of the considerations that the court's had to take under its advisement. Obviously, I don't know, we don't know necessarily the level of communication about what happened prior. In other words, did they talk to each other about it? Maybe before everything. True. But it's also noteworthy that the children did testify or made statements to the effect that they had witnessed sexual assaults occurring to their siblings. I don't think that the fact that they may have had a chance to communicate prior to when the police and school authorities intervened diminishes the reliability of the statement. And I guess there's no implication at all that they all decided that, I'm forgetting, Taisha, the one that did disclose that it was some pre-decided thing that she was going to come forward. I mean, did that seem like that was spontaneous? The impression I got is that it was a girl who had reached a breaking point and needed to talk to someone about what was happening. She's kind of a little fighter. There was testimony that when she was talking to investigators that she had now sort of defined, now I'm finally coming out in the same, what I need to say, kind of tone, which is certainly a consideration as well when we talk about the mental state of a child. So the three children were kept separate. Permission was obtained from the mother to be interviewed. They were interviewed separately. The audio didn't work. They went home. When it was discovered that the audio hadn't worked, they were brought back again two days later, I believe. There was testimony from the investigators that there had been no discussion about it in the interim time period. One aspect that I will grant the defendant in this case is that I think there could have been more brought out in terms of the exact Q&A that occurred during the first interview. When you read the transcript of this, it's largely a narrative of what they said. But I would hasten to add to that, and I know that the counsel sees me as this is sort of bootstrapping Statement 2 into Statement 1, but there was testimony to the fact that what happened in Statement 2 is what happened during Statement 1, that the questions and the answers that were given, particularly the answers that were given, were almost identical except for minor variance. So the court had at its disposal, obviously, the full video and audio of the second statement. So it could, as well as this court, will be able to gauge the questions and the interaction between the investigators and the children. I would also note that perhaps unlike the Miles case that the defendant cites, this isn't a case completely bereft of any sort of indication of what happened during the first interview. I watched, and I know your honors will watch, the first recorded statement. There's no statement, but it's recorded, and your honors can visually observe that the interactions that took place between the officers and the children are substantially similar in that they were used anatomically correct diagrams, a dry erase board, I think, to draw pictures, things of that nature. It certainly is something that substantiates the implication that what happened between 1 and 2 is the same, because obviously the children were given the opportunity to essentially give a narrative description and describe things of that nature of what had happened. I make that argument to segue into the consideration of whether the children used terminology not expected in the child of comparable age. What you'll see is the children do give anatomical descriptions that are consistent with the particular age group, describing pubic regions as deprived, things of that nature. I believe, I don't remember, I believe it was Taisha, it may have been Tashira, I'm not sure. She was actually asked and gave a description of the defendant's level of tumescence, I guess is the best way to describe it, politely. But it was described in such a way that she sort of gave a depiction without insertion of something more sexually advanced for a child of her age. Bear in mind, these were teenagers by the time this case came around for trial, so at that point, they obviously know a lot more about these types of things. When we look at the statements themselves, they do appear, when asked to give anatomical descriptions, are consistent with that type of what their perception would be. Lack of motive to fabricate, it's a very interesting argument that the defendant makes with regards to the statement that Taisha wrote and whether there was a motive. There was never really any motive other than Taisha wanting to come forward to finally say what was going on, because she didn't like what was going on and she was concerned about her siblings as well. That she may express anger at her mother's boyfriend is not a particularly surprising circumstance. I read the issue of lack of motive to fabricate. Oftentimes we see that in external influences that may prompt children to say things because of something else happening in their parents' lives. A mom prompting a child in a divorce proceeding, things of that nature. We can discuss hypotheticals, but I don't think that there's anything in the record that would cut against anything other than the obvious impression given that these are kids who are coming forward and telling investigators what had happened. Through really the course of the interaction between Taisha and the administrators, the counsel makes some argument that the terminology shifted from what she described to Camille Jones, the teacher, and then what she eventually described to the next higher-up, I guess, in the school chain. I don't perceive having had sexual contact and having had contact as being so radically distinguishable that we see an inconsistency in what's being told. Again, we're talking about a nine-year-old girl or so who's being kind of led down the line and being asked to repeat details of something that's obviously very distressing. And certainly, that progression of events, which ultimately required a mandated reporter to get the intervention of the DCFS and the police department, was substantially similar enough that I think that that bolsters the notion that there was not a fabrication going on here, but this is a natural sequence of things, which then, when the other two children came in, sort of globally provided sufficient facts for the court to make a finding that the time and the circumstances were adequate for sufficient safeguards of reliability. Time aspect of it, this was done, everything happened quickly. It wasn't an incidence where this was reported and then it just sort of sat and festered for a long time. Thus along would be perhaps a more substantial argument on the defendant's part that there has now been an opportunity to germinate in the mind different considerations and different facts to bolster things. Now, there was some inconsistency, obviously, between what the three children said. I don't think that that really means anything. In fact, if anything, it probably corroborates an argument that there was a reliability to it because there's always going to be variances in non-coached testimony. That's just the nature of things when you're asking things of children. So these are all considerations that the court had. I believe that when you evaluate that with the standard of review that's applicable in this case with abuse of discretion, it was certainly a reasonable fact finder under that totality of circumstances because ultimately that's what 115-10 requires. An evaluation of it as the totality of the circumstances that the state had met its burden. And so we've asked this court, obviously, in that regard to affirm Circuit Court's ruling. With regards to the constitutional challenge, for a long time there was a notion in Illinois law that there was a convergence of the Eighth Amendment and the Illinois constitutional ideas of cruel and unusual sentences that's been sort of recently repudiated by the Supreme Court. And so we really have to look at these as two separate considerations. Under the Eighth Amendment, there are two particular factors to decide whether or not something is going to be considered categorically unconstitutional. And in light of Graham v. Florida, this becomes an interesting issue because in that case, the court's aware we now have found, the Supreme Court has found unconstitutional mandatory life sentences for juvenile non-homicide offenders. Of course, that's now even expanded to homicide offenders. So obviously there's a special consideration for juvenile offenders. Not applicable in this case, but it does signal a departure from traditionally the Supreme Court precedent, which had always parsed death and non-death cases in separate analyses. So it's appropriate in this case to undertake a discussion about whether it's a categorically unconstitutional sentence, whereas prior to Graham v. Florida, my argument would have been the case. So in this, there's two considerations. One is the objective criteria of society standards that's expressed in legislative enactments and state practice to see if there's a development of a national consensus against a particular sentencing scheme. That was a critical factor in the U.S. Supreme Court cases because there had been almost a universal repudiation of the appropriateness of life sentences for juvenile offenders. The second is whether there's a court that then has to, on top of that, exercise an independent judgment about whether that punishment violates the Constitution's Eighth Amendment. Counsel did do a very good job in reply brief, I think, addressing a lot of the statutes that the state had brought up, which pointed out, and I concede, are mostly permissive natural life sentences rather than mandatory life sentences. The purpose of bringing the statutes out, though, is not to buttonhole Illinois law into this law as a direct parallel. It's actually meant to sort of augment what had been initially brought up in the Huddleston case about there being several states that have mandatory natural life sentences, and the point being that if we're going to develop an analysis or an exploration of a national consensus, I think it's relevant to see whether or not the concept of a sex offender and a child in a natural life sentence as a factual combination violates or is being something that legislatures are turning their backs on. Because it's also important to consider that while these may be permissive sentences, there are also statutes that are authorizing life sentences for first-time single-sex-offense violation, which is not really out of Illinois, of course. This life sentence is imposed only under the condition of multiple victims, and I think that's an important consideration. So while not disputing the defendant's well-done differentiation of these statutes in the statute at hand, the broader picture is where does the United States legislatures of the states of this country take their position with regards to natural life sentences and sex offenders, and it does not appear to be a consensus against life sentences for sex offenders, and that's one consideration. Whether the court exercises independent judgment or the punishment violates the Constitution, what the court then has to look at is whether or not the sentencing scheme and the practice serves a legitimate penological goal, such as retribution, deterrence, incapacitation, or rehabilitation. Punishments often have or carry with them different goals. There's a deference that's given to the legislatures of particular states to make that determination about what is an appropriate penological goal. Sexual predator cases probably don't need any lengthy argument from me to underscore that they are unique in particularly vile offenses, not just because they are vile in and of themselves, which of course they are, but because of the broader implications of those types of offenses involving both the offender and the victim. From the offender standpoint, there's ample studies out there which discuss the high recidivism rate for sexual offenders. It's something that was discussed in the Huddleston case, actually, and it's very true. Also, when we talk about the victims, there's little doubt that victims of sexual offenses suffer, particularly when they're children, suffer long-term psychological scarring that is perhaps unique and particularly heinous with regards to the after-effects of the crime, with regards to their ability to formulate personal relationships, et cetera. At one point in the defendant's argument, he notes non-unfairly that, well, we haven't really seen evidence of that with these victims. But I would also hastily point out that sometimes we don't know when that's going to manifest itself. Taisha's victim-witness statement in its, as I say, angry, vitriol, clearly shows a young woman who's going to have some problems forming relationships with men in the future, understandably so. So when we look at whether this sentencing scheme in natural life serves legitimate penological goals, which in this case would be deterrence and incapacitation, because obviously rehabilitation is out the window in a natural life sentence, those special characteristics of this type of repeat offender or multiple-victim offender, particularly an offender who's had an occupied position of some authority over his children, and in terms of being entrusted with their care, we have a legitimate interest that's served by a natural life sentence. So this court should not find it violates the Eighth Amendment. With regards to the state constitution, that question's largely been settled by the Huddleston opinion. I'm not going to argue much beyond that. It discusses in that case much of what I've just discussed now with regards to the unique characteristics of sex offenses of this nature against children and the broader ramifications and the ability or the need of a society to protect itself from these types of people who are particularly serious risk for recidivism. Therefore, Your Honors, I would stand on my arguments to and for, as the defendant appears to as well. Does the court have any questions? I don't believe so. Thank you, Counsel. Counsel? Excuse me. Your Honors, just to respond briefly to the points made by Mr. Daley, Judge, you've raised a question that you've indicated in oral argument that what do you make of all these interviews that they didn't have any prior knowledge of that this interview was taking place. I'll grant you that. It does not appear that these children knew, at least at the time of the first interview, that they knew that this interview was going to take place. All they did know is that they were being transported there by an officer of the law and that something was about to happen. That's all we did know. But that, therein lies the problem, Your Honor, because the first interview clearly taints the effects of the second interview. By the time of the second interview, four days later, children do know what they're going to be questioned about. Children do know what type of questions are going to be asked. Children do know why they're there. And that's why it's critical. It's critical for the State to deduce evidence on the substance of the questions asked in the first interview. This is no different than the Miles case and the Simpson case, in the sense that the evidence of a prior, recent interview where there has been potential for this allegation of sexual abuse coming out, it requires the State to show, hey, show me that this second interview that you had wasn't tainted by the first. And granted, both sides, I mean, the testimony of trial was the outcome of the statements of the same, from one to the second were the same, but even the Supreme Court says that you should not presume from the record that suggestive techniques or questions weren't used. Even a simple question that doesn't appear leading to us, like, what bad things did he do to you, is an open-ended question, but in the end would be things that at least imply some type of thing that should have happened. And that's the problem. So what's the solution? What could the State have done here? Well, in the record, and I'll point the court to, I think it's C557, Officer Gilbert's role was to watch this video and take, quote, verbatim notes of this interview. None of that was ever introduced at the trial. None of that was ever introduced at the hearing. That would be one way for the State to satisfy their obligation to show what the content, the reliability of the circumstances were of that first interview. And Ms. Bailey talks about how none of the investigators talked with the children between the first and second interview. That's true, but it doesn't mean that the children didn't talk amongst each other between the first and second interview. It doesn't mean that the children didn't talk to their mother after the first interview. It doesn't mean that the children didn't talk to anybody else after the first interview. And as a matter of fact, there was no evidence adduced to that fact about who the children talked to between March 7th and March 11th, a very critical fact to determine whether or not the second interview was, in fact, tainted by the first. There was also, you mentioned, Judge, whether there was any implication that there was some sort of decision to sort of fabricate, you know. And I think Mr. Daly brought up the notion that typically when this lack of motive to fabricate occurs, it's usually because of something going on in the mother's or the father's life. Well, if you look at the letter that Taisha Kay wrote very carefully, you'll see that there is at least some evidence for that. In other words, Taisha Kay comes out and says, Mr. Oates gets mad at my mom for seeing other men. Mr. Oates yells at my mom. Mr. Oates doesn't yell at my sister because she likes him, but she yells at me. There clearly is at least from that initial statement, an initial spontaneous statement, some evidence of a lack of motive to fabricate, which was not addressed by the trial court. The other thing that Mr. Daly mentioned was the use of appropriate terminology. Well, and while he's correct in his recitation of the facts of the court, I'd also like to point this court again to that written statement by Taisha Kay. She was nine years old at the time that she wrote out this statement. In her statement, she uses the word, specifically the word rape, that Mr. Oates rapes me. To me, you know, I don't have a lot of, you know, child psychology classes or whatnot, but that does not seem to be a word that would be associated with a nine-year-old kid. And then finally, with respect to the constitutional arguments, Judge, I know this court is bound by Huddleston, and I grant that. But, you know, if you look at the Huddleston case, there are a lot of differences between that case and this case. The primary difference being that the defendant in Huddleston did indeed have a prior record and did indeed have other evidence of indicia of being a repeat sex offender. In other words, he had pornography on his computers and whatnot. The other evidence there, the other distinction is that was absent in this case, even though there is some evidence from the victim's statement, is the lack of any hard psychological evidence that they were impacted. I'm not saying that the children weren't impacted if this indeed happened. Of course they could be, and Mr. Daly is right. But sometimes it manifests itself differently from one person to another. But the point is there's a key distinction with Huddleston. Here the defendant was not a prior offender. Here the case was closely balanced in that he was acquitted of three of the counts. And here there didn't seem to be the evidence of impact to the victims that was clear in Huddleston. And again, I just ask the court the rhetorical question of how are you going, and restoring the offender to citizenship as a goal of the Illinois Constitution if it does not take into account the possibility of rehabilitation. Thank you, Your Honor. Thank you, Your Honor. We appreciate the briefs and arguments of counsel, and we'll take the case under advisement. There are no further oral arguments scheduled before the court today, so we're adjourned for the day. All rise.